(69 App. Div. 512.)

PEOPLE v. DOOLEY et al.

(Supreme Court, Appellate Division, Second Department.    March 14, 1902.)

1. MUNICIPAL CORPORATIONS—CITY MAGISTRATES—INFERIOR COURTS.

The New York City magistrates continued in office or created by Greater New York Charter, §§ 1392, 1394, 1396, with power as originally given the city magistrates by Laws 1895, c. 601, § 3, which gave such magistrates all the powers and jurisdiction formerly exercised by police magistrates, who, by Consolidation Act, § 1562, had jurisdiction to hear cases of arrest for intoxication or disorderly conduct, are, in the exercise of such power, courts of inferior criminal jurisdiction, within the meaning of Const. 1894, art. 6. § 18, providing that inferior local courts of criminal and civil jurisdiction may be established by the legislature.

2. SAME—ELECTION—STATUTES—VALIDITY.

Laws 1901, c. 466, § 1392, authorizing the election of city magistrates in each congressional district of the borough of Brooklyn, and the election of two such magistrates at large by said borough, is in violation of Const. 1894, art. 6, § 17, providing that all judicial officers in cities, not otherwise provided for, shall be chosen by the electors thereof, or appointed by the municipal authorities, in failing to require the election of magistrates to be by the entire city.

3. SAME.

The constitutional provision is prospective, and applies to New York City magistrates, though the constitution was enacted in 1894, and city magistrates were first created by Laws 1895, c. 601.

4. SAME.

Const. 1894, art. 6, § 18, authorizing the legislature to establish inferior courts, but requiring all judicial officers, except as therein provided, to be elected or appointed at such time and in such manner as the legislature may direct, is to be considered in connection with section 17, providing that all judicial officers in cities, whose election or appointment is not otherwise provided for, shall be chosen by the electors of the city, or appointed by the authorities thereof, and therefore the former section does not empower the legislature to authorize the election of inferior judicial officers in a city in a manner other than by an election by the entire city.

5. SAME.

Const. 1894, art. 6, § 17, requiring judicial officers of cities, not otherwise provided for, to be chosen by vote of the electors of the city, or appointed by the municipal authorities thereof, refers to the entire city at the time of the creation of such office; and a statute providing for the election of such officers by the electors of the entire city is not rendered unconstitutional by the incorporation of the city into a larger city, if the jurisdiction of the court is confined to the territory in which the officer is voted for.

6. SAME.

Const. 1894, art. 10, § 2, providing that all city officers whose election or appointment is not provided for by the constitution shall be elected by the electors of such city, or by some division thereof, does not apply to judicial officers in such cities; but their election or appointment is governed by article 6, § 17, requiring the election of such officers, if not otherwise provided for, to be by vote of the electors of the entire city, or by appointment by the municipal authorities.

7. SAME.

Const. 1894, art. 12, § 3, which provides that all elections of city officers, including supervisors and judicial officers of inferior local courts, in any city, shall be held at a certain time, etc., though speaking of officers elected in a part of the city, only applies to officers who may be chosen as provided by law, by parts of the city, and does not modify Const. 1894, art. 6, § 17, requiring judicial officers of a city, not other-

wise provided for, to be chosen by vote of the electors of the entire city, or appointed by the municipal authority.

8. SAME.

Const. 1894, art. 6, § 18, authorizing the legislature to establish inferior courts, does not authorize the creation of courts having jurisdiction over, and elected in, a territory not constituting a territorial division of the state; and thus Laws 1901, c. 466, § 1392, authorizing the election of city magistrates in each congressional district of the territory of Brooklyn, and two such magistrates at large in such territory, is not authorized, as a congressional district is a federal, and not a state, subdivision, and the part of the statute authorizing the election of magistrates at large, being a part of the completed scheme disclosed by the statute, will fall with the remainder of the statute.

9. SAME.

Where the term for which a municipal officer may be appointed is supposed to have been shortened by a statute which is invalid, a provision in his appointment fixing the termination of his term at the time it would end if the statute were valid will be regarded as surplusage, and the officer is entitled to hold for his full term.

Goodrich, P. J., and Hirschberg, J., dissenting.

Appeal from special term, Kings county.

Action by the people of the state of New York against Edward J. Dooley and others to determine the right to the office of city magistrate. From a judgment in favor of the defendants, the plaintiff appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

James McKeen and William J. Carr (George W. Wingate, on the brief), for the People.

John L. Hill (Jerry A. Wernberg and Robert H. Elder, on the brief), for respondents.

WILLARD BARTLETT, J. The determination of this appeal depends upon the constitutionality of the amendments to the Greater New York charter, enacted by the legislature of 1901, providing that the city magistrates in the Second division of the city of New York should be elected, instead of being appointed by the mayor. Under the Greater New York charter as originally enacted (chapter 378 of the Laws of 1897), the city of New York was divided into two divisions, for the purposes of the administration of criminal justice. The First division comprised the boroughs of Manhattan and the Bronx. The Second division comprised the boroughs of Brooklyn, Queens, and Richmond. Section 1390, Id. At the time of the enactment of the original Greater New York charter the office of city magistrate already existed in the former city of New York, having been established by chapter 601 of the Laws of 1895. The charter provided that the city magistrates in office when it took effect should continue to hold office until the expiration of their respective terms, and should be known as the "City Magistrates of the First Division." It further provided that their successors should be appointed in the same manner as provided in the act of 1895. That act provided that they were to be appointed by the mayor, and should hold office for a term of 10 years. The charter conferred upon the city magistrates thus

continued in office and their successors the same power and jurisdiction which they had by law upon December 31, 1897. Section 1392, c. 378, Laws 1897. The charter then proceeded to provide for the office of city magistrate in the Second division. The police justices in the former city of Brooklyn, who should be in office on January 31, 1898, were to continue in office for the residue of their respective terms, but were to be "known as city magistrates of the Second division of the city of New York, and have the powers and duties hereinafter prescribed for city magistrates and no other." After providing for the appointment of additional city magistrates, who should be residents of the borough of Queens and residents of the borough of Richmond, the charter prescribed as follows:

"The successors of said magistrates shall at all times thereafter be appointed by the mayor of said city, and shall be residents and electors of the borough from which said magistrates whom they shall be appointed to succeed were appointed, and shall hold office for ten years." Section 1394, Laws 1897.

The powers of the city magistrates whose continuance in office or appointment was thus provided for were dealt with in section 1396 of the original Greater New York charter in these words:

"The said magistrates appointed or continued in office pursuant to this title, shall have and exercise within the said Second division such powers as are conferred by law upon the city magistrates in the city of New York, by chapter six hundred and one of the Laws of Eighteen Hundred and Ninety-Five, and the acts amending the same, except as herein otherwise provided."

There was thus established a uniform system for the selection of city magistrates in both divisions of the Greater New York. After the expiration of the terms of those who were expressly continued in office, their successors were to be appointed by the mayor for terms of 10 years each. Generally speaking, their powers were those formerly possessed by police justices in the old city of New York. As has already been seen, the charter referred to their powers as having been conferred upon them by the act of 1895. Referring to that act, we find that section 3 thereof provides as follows:

"On and after the first day of July, eighteen hundred and ninety-five, the city magistrates appointed pursuant to this act shall have and shall exercise all the powers and jurisdiction, not inconsistent with the provisions of this act, which, on the thirtieth day of June, eighteen hundred and ninety-five, shall be vested by law in the police justices, except proceedings respecting bastards." Chapter 601 of the Laws of 1895, § 3.

On the date thus specified the general provisions of law in force relating to the police courts and police justices, and their powers in the city of New York, were to be found in title 11 of the New York City consolidation act (Laws 1882, c. 410, §§ 1541 to 1568). Among these provisions was the following:

"In all cases of arrest for intoxication or disorderly conduct in the city of New York the police justices shall have power, in addition to holding the party to bail for good behavior, to impose a fine not exceeding ten dollars in each case, or to commit to the city prison not exceeding ten days, each day of imprisonment to be taken as a liquidation of one dollar of the fine." Section 1562, Laws 1882.

This section indicates that a city magistrate was authorized to exercise some functions over and above those of a mere committing magistrate. He could try and determine the guilt of persons charged with intoxication or disorderly conduct, and, in case of conviction, impose a fine or sentence of imprisonment. To this extent he exercised the power of a court, and, in fact and law, held a court of inferior criminal jurisdiction, within the meaning of the constitution. It is to be noted that in the New York City consolidation act the tribunals over which the police justices presided were denominated "police courts," and that in the act of 1895, as well as in the Greater New York charter, the word "court," as applicable to the tribunal over which a city magistrate presides, frequently occurs. Laws 1895, c. 601, §§ 4, 5, 8; Laws 1897, c. 378, §§ 1398, 1400. Furthermore, in the case of Koch v. City of New York, 152 N. Y. 72, 86, 46 N. E. 170, 175, in which the court of appeals sustained the constitutionality of the act of 1895 which abolished the office of police justice and created the office of city magistrate in the former city of New York, the tribunal of the city magistrates is spoken of as "the new court." In 1901, when the legislature came to revise the Greater New York charter, by chapter 466 of the Laws of that year, it provided for the election of city magistrates within the borough of Brooklyn in lieu of their appointment. "At the general election to be held in the borough of Brooklyn in the year nineteen hundred and one," says section 1392 of the revised Greater New York charter, "there shall be elected in each congressional district, as then constituted in said borough, one city magistrate, and in the territory constituting the borough of Brooklyn there shall be elected two city magistrates at large, and the terms of office of all said city magistrates so elected shall commence on the first day of January nineteen hundred and two and continue for six years thereafter." In the boroughs of Manhattan and the Bronx the method of appointment was retained. Under this provision the election of city magistrates therein provided for took place in 1901; and the result of the canvass showed the election of one magistrate, each, in the six several congressional districts comprised within the borough of Brooklyn, and two magistrates voted for by the electors in the borough at large. The right of the persons thus chosen was questioned by the city magistrates holding office in the borough of Brooklyn at the time of the election by virtue of appointments from the mayor under the original Greater New York charter. The attorney general instituted the present action to settle the controversy which arose between the two sets of claimants. Four of the persons who had been appointed city magistrates by the mayor under the original Greater New York charter, Messrs. Dooley, Furlong, Naumer, and O'Reilly, interposed an answer setting up the unconstitutionality of the legislation changing the method of selection from the appointive to the elective system. The attorney general demurred to their answer, and the demurrer has been overruled at the special term. From the interlocutory judgment entered upon the decision there, the attorney general has appealed to the appellate division.

It should be noted here that the four respondents whose contention that the charter amendment is unconstitutional has been sustained

in the court below were appointed by the mayor under peculiar circumstances. The amendment of 1901 not only provided that city magistrates in Brooklyn should be elected, instead of being appointed, but also assumed to extend the terms of four city magistrates in office when it took effect. The terms of these officers expired on the last day of April, 1901; but the amendment purported to extend their terms until January 1, 1902. Laws 1901, c. 466, § 1392. This provision was held to be unconstitutional in a mandamus proceeding heard before Mr. Justice Gaynor, whose decision to that effect seems to have been acquiesced in by all parties concerned. Kelly v. Van Wyck, 35 Misc. Rep. 210, 71 N. Y. Supp. 814. A writ of mandamus was granted, commanding the mayor to appoint the successors of the four persons whose terms expired on April 30, 1901; and, in compliance with the writ, Mayor Van Wyck appointed each of the four respondents. It is true that, although the original Greater New York charter expressly provided that persons so appointed should hold. office for 10 years (Laws 1897, c. 378, § 1394), the mayor's certificate of appointment in the case of each of the respondents declared the appointment to be "for the unexpired portion of the term which commenced May 1, 1901, and which ends December 31, 1901"; thus recognizing the validity of the legislation providing for the future election of city magistrates in Brooklyn, which is attacked upon the present appeal. Whether this attempted limitation of the term of appointment in the certificate has any effect or not, will be discussed later.

The constitutional provision which is alleged to have been violated by the enactment of the amendment in question here is the last clause of section 17 of article 6 of the constitution of 1894, which reads as follows:

"The electors of the several towns shall, at their annual town meetings, or at such other time and in such manner as the legislature may direct, elect justices of the peace, whose term of office shall be four years. In case of an election to fill a vacancy occurring before the expiration of a full term, they shall hold for the residue of the unexpired term. Their number and classification may be regulated by law. Justices of the peace and judges or justices of inferior courts not of record, and their clerks, may be removed for cause, after due notice and an opportunity of being heard, by such courts as are or may be prescribed by law. Justices of the peace and district court justices may be elected in the different cities of this state in such manner, and with such powers, and for such terms, respectively, as are or shall be prescribed by law; all other judicial officers in cities, whose election or appointment is not otherwise provided for in this article, shall be chosen by the electors of such cities, or appointed by some local authorities thereof."

The argument is that the city magistrates provided for in the charter are judicial officers in cities whose election or appointment is not otherwise provided for in article 6 of the constitution; that hence the command that such judicial officers shall be chosen by the electors of such cities, or appointed by some local authorities thereof, becomes applicable; and that, where the legislature determines that the choice shall be made by election, all the electors in the city in which the officers are to exercise jurisdiction must be afforded an opportunity to participate in the election. This opportunity, it is said, has not been afforded in the present case, inasmuch as six of the magistrates

who have received certificates of election were voted for only by the electors of the several congressional districts in which they respectively reside, while two of them were voted for not by the electors throughout the city, but only by voters in the borough of Brooklyn. It is also argued that the last clause of section 17 of article 6 of the present constitution contemplates a uniform system for the selection of the same class of judicial officers throughout a single city, and that it is not competent for the legislature to provide, as to a number of judicial officers of the same class, that a portion of them in one part of the city shall be selected by appointment, and another in another part of the city be chosen by popular election. The phrase "the electors of such cities" is a broad one, without qualification or limitation in the clause in which it occurs, and is certainly comprehensive enough to include all the persons entitled to vote within the municipality. I do not well see how it can be given any effect less than this without adding to the constitution something which we do not find in it. The language is not ambiguous, and there seems no reason for restricting it, or holding that it can apply to the electors of a part only of a city, when, if the intention thus to limit it had existed on the part of the constitutional convention, it would have been so easy to express that intention in a manner that would prevent all possibility of doubt on the subject. The purpose in view in framing the clause of section 17 under consideration appears to me to be perfectly plain. It was to entitle all the electors within the territorial jurisdiction of the city judicial officers therein mentioned to the right to take part in choosing such officers, in case the legislature determined that they should be chosen by election rather than by appointment. If this view is not correct, it is difficult to see why the legislature might not provide for the election by the voters in the borough of Richmond alone of city magistrates whose jurisdiction should extend all over the territory of the Greater New York. This construction, however, is assailed on various grounds. It is suggested, in the first place, that the last clause of section 17 of article 6 in the present constitution has no application at all to the office of city magistrate, inasmuch as that office was created in 1895, after the adoption of the present constitution, and that the section is to be deemed to apply only to offices existing at the time when the constitution was adopted. The basis for this suggestion may be found in the language used by O'Brien, J., in Curtin v. Barton, 139 N. Y. 505, 510, 34 N. E. 1093, where that learned judge intimates that section 17 may apply only to offices and courts existing when the constitution went into effect. It is true, he is there speaking of section 18 of article 6 of the constitution as amended in 1869, but that section was substantially the same as the present section (17); the alterations made by the convention of 1894 being only immaterial verbal changes. In Curtin v. Barton, supra, however, the court of appeals distinctly refused to determine the question whether the provision of the constitution under consideration was restricted in its application to tribunals and officers in existence at the time of the adoption of the constitution; and there is nothing in what was said on the subject in that case to indicate which construction the court of appeals deemed preferable. Under these circum-

stances, we must determine the question with the aid of the best light we can get; and I am strongly inclined to think that the clause under discussion should be deemed operative not only upon city judicial officers whose offices were already in existence, but upon those whose offices might thereafter be created. The general rule is that the operation of a constitution is prospective (Cooley's Const. Lim. [6th Ed.] 77); and where the courts have held otherwise, and given the fundamental law a retrospective effect, or confined its operations only to a condition of things existing at the time of its adoption, this has been done because the intent thus to limit the effect of the constitutional provision has been either clearly manifest in the instrument itself, or is distinctly inferable from the existing conditions with which the framers of the constitution were attempting to deal. Thus in the cases of People v. Draper, 15 N. Y. 532, and Fire Dept. of New York v. Atlas S. S. Co., 106 N. Y. 566, 13 N. E. 329, the constitutional provision under consideration (section 2 of article 10 of the constitution of 1846) distinguished clearly between officers whose offices then existed "and all officers whose offices may hereafter be created by law," so as to leave absolutely no doubt that the officers referred to in the first part of the section were only those whose offices were already in existence. The same observation applies to the case of People v. Palmer, 52 N. Y. 83.

But it is argued that, even if it be conceded that section 17 of article 6 applies to the office of city magistrate, we must read that section in connection with section 18, which is said to be in pari materia with it, and that such reading forbids the conclusion reached by the court below. Section 18, so far as applicable to the questions under consideration here, provides as follows:

"Inferior local courts of civil and criminal jurisdiction may be established by the legislature, but no inferior local court hereafter created shall be a court of record. * * * Except as herein otherwise provided, all judicial officers shall be elected or appointed at such times and in such manner as the legislature may direct."

City magistrates, we are told, are judges of inferior local courts, created under section 18, and its language therefore applies to them. I agree that the tribunals over which they preside are inferior local courts, within the meaning of section 18 of the constitution; but it does not follow that they are to be elected or appointed in such manner as the legislature may direct, under the provisions of the last clause of such section. That clause is qualified by the introductory phrase "except as herein otherwise provided." This exception cannot be disregarded, and when we look back we find that so far as judicial officers in cities are concerned, with the exception of justices of the peace and district court justices, the requirement is that they shall be chosen by the electors of such cities, or appointed by some local authorities thereof. As was pointed out by Mr. Justice Marean in the case of People v. Guden (printed in the appeal book herein) 75 N. Y. Supp. 347, the exception in section 18 excludes the cases provided for in section 17.

Again, it is contended that, if the judgment below is correct, the organization of the present municipal court in the city of New York

is unconstitutional, because the justices are elected in specified districts in the city, and exercise their functions in various other districts. So, also, it is suggested that the former system of district courts in the old city of New York must also, on the same principle, be deemed to have been unconstitutional. This argument, I think, overlooks the peculiar provisions of the constitution in regard to district courts in cities. Since 1846 the legislature has always had control over the manner in which district court justices in cities should be elected. Thus, in the constitution of 1846 itself, we find this provision:

"All judicial officers of cities and villages, and all such judicial officers as may be created therein by law, shall be elected at such times and in such manner as the legislature may direct." Const. 1846, art. 6, § 18.

The judiciary article, as amended in 1869, was more specific, referring to district court justices expressly, as follows:

"Justices of the peace and district court justices shall be elected in the different cities of this state, in such manner, and with such powers, and for such terms, respectively, as shall be prescribed by law." Article 6 of the constitution as amended in 1869 (section 18).

And in the constitution of 1894 we find substantially the same language in section 17, where it is provided that:

"Justices of the peace and district court justices may be elected in the different cities of this state in such manner, and with such powers, and for such terms, respectively, as are or shall be prescribed by law."

The legislature, thus possessing, within its discretion, absolute power as to the manner in which district court justices might be elected, could provide for their election in districts, if it saw fit. The same line of reasoning applies to the justices of the municipal court; it having been determined by the court of appeals that the municipal court of the city of New York, as established by the Greater New York charter, is merely a continuation of the pre-existing district courts of the same city and the justices' courts in the city of Brooklyn. Worthington v. Accident Co., 164 N. Y. 81, 58 N. E. 102. Hence the legislature could authorize the election of the justices thereof by districts, under section 17 of article 6 of the constitution of 1894, already cited. The fact, therefore, that municipal court justices may be elected by districts, in no wise tends to show that city magistrates may thus be constitutionally chosen.

By the Greater New York charter (section 1345) the city court of New York was continued, "and the said court and the justices thereof shall have the same powers and jurisdiction as are now conferred upon them by law." The justices of this court are chosen only by electors in the territory which comprised the old city of New York before consolidation; and it is suggested that a construction of the last clause of section 17 of article 6 of the constitution which requires that judicial officers in cities, if elective, shall be chosen at an election in which all the electors of such cities shall have an opportunity to participate, would render the present method of choosing city court justices unconstitutional. This argument I would answer thus: The word "cities," as employed in that section, refers to municipalities existing as cities at the time provision was originally made by law for the es-

tablishment of the court or the creation of the judicial office; and a statute providing for the choice of such judicial officers by the electors throughout the whole territory of such a city is not rendered unconstitutional by the subsequent incorporation of that city in a larger one, so long as the jurisdiction of the court and its judges remains confined to the territory in which the judges are voted for. From 1848 until 1873 the police justices of the old city of New York were elected in separate judicial districts, and assigned by the common council to sit in the various police courts in rotation. Laws 1848, c. 153, §§ 7, 8. Their offices were rendered appointive by chapter 538 of the Laws of 1873. In behalf of the appellants it is said that this system of the election of police justices by districts in the old city of New York must have been null and void from 1848 to 1873, if the respondents are right in their position here. This does not seem to me to be a correct deduction from the facts. During the entire period up to the time when the amended judiciary article of 1869 went into effect, the constitution of the state contained the provision already quoted in reference to another point, to the effect that all judicial officers of cities and villages, and all such judicial officers as might be created therein by law, should be elected at such times and in such manner as the legislature might direct. Const. 1846, art. 6, § 18. This authorized the election of the police justices in the city of New York by districts, and, if the system at any time became obnoxious to the fundamental law, it was not until January 1, 1870, when the amended judiciary article of 1869 took effect; and the appointive system which was substituted therefor, and was clearly constitutional, went into effect shortly after the passage of the act of 1873 (May 17, 1873).

Two other provisions of the constitution are cited as tending to show that the result reached in the court below was erroneous. One of these provisions is contained in section 2 of article 10, in these words:

"All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose."

I do not see how this provision can be deemed applicable to the case of judicial officers in cities, since their election or appointment is provided for in a prior article of the constitution, to wit, in section 17 of article 6.

The other provision cited is contained in section 3 of article 12, which relates to the election of city officers, and the main purpose of which is to regulate the times at which the elections of such officers shall be held. The only portion of the section material to the present inquiry reads as follows:

"All elections of city officers, including supervisors and judicial officers of inferior local courts, elected in any city or part of a city, and of county officers elected in the counties of New York and Kings, and in all counties whose boundaries are the same as those of a city, except to fill vacancies, shall be held on the Tuesday succeeding the first Monday in November in an odd-numbered year, and the term of every such officer shall expire at the end of an odd-numbered year."

The phrase "part of a city," in this section, is referred to as indicating that the legislature may authorize the election of judicial officers of inferior local courts in cities for a subdivision of a municipality, and that it is not required, where such officers are elected, to enable all the electors in the city to participate in the election. Full effect, however, may be given to the phrase by regarding it as a qualification applying only to city officers and supervisors who are chosen in parts of a city; and it should not be regarded as applicable to judicial officers of inferior local courts, in view of the preceding provision of the constitution contained in section 17 of article 6, regarding the manner in which judicial officers in cities must be chosen.

This brings us to another question suggested by the amendatory legislation, the constitutionality of which is here attacked. May not the legislature provide for the establishment of inferior local courts of criminal jurisdiction in a city, confining the jurisdiction of the tribunals thus created to that particular portion of the city whose electors are allowed to participate in the choice of the magistrates? And in case this was done, would not the requirements of section 17 of article 6, that such judges, if elected, shall be chosen by the electors of such cities, be substantially complied with, even though no electors were allowed to vote for them except such as resided within the territory to which the jurisdiction of the court was to be confined? In other words, may not the amended provisions of the Greater New York charter, providing for the election of city magistrates, some of them by congressional districts, and others at large, in the borough of Brooklyn, be regarded as a valid exercise of the power conferred upon the legislature by section 18 of article 6 to establish inferior local courts of criminal jurisdiction? The answer to this question is furnished by the decision of the court of appeals in the case of People v. Porter, 90 N. Y. 68. There an act of the legislature was pronounced unconstitutional which assumed to create a police court for a district not coterminous with the boundaries of any county, town, city, or village. In that case, Andrews, C. J., wrote as follows:

"The general authority given to the legislature by section 19, art. 6, to establish inferior local courts, supplements the other provisions, and was doubtless intended to authorize the legislature to establish local courts on the organization of new cities or villages, requiring the establishment of local judicial tribunals therein, or where, in an existing city or village, the existing courts were inadequate. But we are of opinion that the language of this section must be construed to refer to local courts, as historically known (that is, courts established for and within one of the recognized territorial divisions of the state, and as a part of the system of local government), and that it cannot be so construed as to authorize the legislature to carve out from the territory of the state a district for judicial purposes, not bounded by town or county, city or village, lines, and erect therein a local court. This construction is confirmed by what has been called the 'political tendency of the constitution.' The intention of the instrument was to define, as far as practicable, all the courts of the state; and, so far as they are defined, they are either courts of general jurisdiction, coextensive with the whole state, or courts of counties, towns, villages, or cities. By the section in question a flexible provision was made, to meet the wants of new political communities, which from time to time should be organized according to the general plan. The constitution seems carefully to guard the autonomy of the several divisions in all matters of local government, and to avoid, as far as practicable, any confusion or division of powers, or any

obliteration of their local independence and control in all matters of local government. * * * It would not, we think, comport with the spirit of the constitution to allow a portion of a town or of a county, not constituting either a city or village, to be dissevered, for local judicial purposes, from the rest, leaving it a unit for all other purposes of civil government. It would tend to a separation and confusion of interests, and impair the usefulness of the system of town and local government, plainly fostered by the constitution."

The congressional districts in the borough of Brooklyn, in which the large number of city magistrates of the Second division were respectively to be chosen, are not recognized territorial divisions of the state, forming a part of the system of local government, but are established for federal purposes; and it seems to me that the power to create an inferior local court for such districts is denied by this decision in the Porter Case. It may be that if the legislature had undertaken to create an inferior local court of criminal jurisdiction for the territory of Greater New York, bounded by the limits of Kings county, the statute establishing such a tribunal could be deemed constitutional; but this has not been attempted in the present case. There is an intimation that a distinction can be made in regard to the two magistrates elected at large in the borough of Brooklyn, the boundaries of that borough being coterminous with those of the county of Kings; but I think that the provisions in regard to those two magistrates are so interwoven with the entire scheme as to be indissoluble from it, and that all the legislation on the subject must stand or fall together.

As has already been pointed out, the certificates of appointment held by the four respondents herein, by the terms of the instruments, declared, in substance, that their offices as city magistrates should terminate on December 31, 1901. This declaration, however, must be regarded as surplusage. The section of the Greater New York charter in force at the time the appointments were made provided that the term of a city magistrate should be 10 years; and when the mayor appointed a person to that office he was entitled to hold it for the term thus prescribed by law, unless that term had been abridged by some other law constitutionally enacted.

To sum up the general conclusions reached in this opinion, they may be stated thus: (1) The amendatory legislation contained in the revised Greater New York charter, making the city magistrates of the Second division in the borough of Brooklyn elective, instead of appointive, is unconstitutional; (2) the repealing clauses which form a part of that amendatory legislation are so connected with it that they are not to be regarded as any more effective than the rest, and hence a judgment condemning the substitution of the elective for the appointive system, so far as the borough of Brooklyn is concerned, operates to restore the provisions of the original Greater New York charter in regard to the appointment of magistrates in the territory in question; and (3) the demurrer to the answer of the four respondents herein, on the ground that it was insufficient in law upon the face thereof, was properly overruled.

There is another question discussed in the briefs, the determination of which does not seem essential upon this appeal, inasmuch as it does

not affect any of the respondents now before the court. Section 1401 of the Greater New York charter provides that:

"No person shall be appointed to the office of city magistrate unless he shall have been admitted to practice as an attorney and counsellor at law in the courts of this state at least five years prior to the date of such appointment, unless he was a police justice in office on the first day of January, eighteen hundred and ninety-five."

It is said that three of the defendants in this action, Messrs. Ingersoll, Devoy, and Brennan, are not lawyers of the requisite standing, and hence were not eligible for election. As neither of these gentlemen is a respondent here, and as there appears to be no question about the qualification in this respect of the persons who are respondents, it is unnecessary now to express any opinion upon the point.

For the foregoing reasons, I advise an affirmance of the interlocutory judgment appealed from.

JENKS, J., concurs.

WOODWARD, J.  I concur in the result reached by Mr. Justice BARTLETT, but I am unable to agree with him in so far as he suggests that, under the language of the last clause of section 17 of article 6, the legislature has no power to provide for the election of police magistrates by districts. Under the constitution, as adopted in 1846, it was provided by section 18 of article 6 that "all judicial officers of cities and villages, and all such judicial officers as may be created therein by law, shall be elected at such times and in such manner as the legislature may direct." Acting under this provision, the legislature, by chapter 153 of the Laws of 1848, provided for the establishment of the office of police justice, and six police justices were to be elected,—one in each of the six districts created by the act. These police justices succeeded by that statute to the power and jurisdiction which had previously been vested in officers entitled "Special Justices for Preserving the Peace in the City of New York," and their jurisdiction was exclusively criminal. Wenzler v. People, 58 N. Y. 516, 521. Under the amended judiciary article of 1869, it was provided, in section 18 of article 6, that "justices of the peace and district court justices shall be elected in the different cities of this state, in such manner, and with such powers, and for such terms, respectively, as shall be prescribed by law," which was, in effect, saying that as to these offices, which were embraced in the general provision for "all judicial officers of cities and villages" of the former section 18, the legislature might continue to provide for their election by districts or by general ticket. The district courts of the city of New York were originally created by chapter 153 of the Laws of 1848, which established in each of the six judicial districts into which, by the act, the city was divided, a court "to be called the justices' court of the city of New York," and in each district there was to be elected a justice to hold the court in said district. These justices' courts, and the justices thus elected, succeeded to the jurisdiction which had belonged to the officers known as the "Assistant Justices of the City of New York," and to the courts known by the name of the "Assistant Justices' Court," which courts and justices were by the said act abolished. The

name of these courts, having only a civil jurisdiction, was changed by the provisions of chapter 276 of the Laws of 1848, and by a subsequent enactment (chapter 324, Laws 1852) the name was again changed to that of "District Courts," by which name they were mentioned in the constitutional amendment of 1869. Wenzler v. People, supra. It will thus be seen that it had been the custom, at least in the city, of New York, to elect both police justices and district court justices· by districts created by the act of the legislature. As to justices of the peace and district court justices, the amended constitution provided that they should be elected "in such manner, and with such powers, and for such terms, respectively, as shall be prescribed by law," thus indicating no intention of limiting the power of the legislature as to the choice of such officers by districts. It was then provided that "all other judicial officers in cities, whose election or appointment is not otherwise provided for in this article, shall be chosen by the electors of cities, or appointed by some local authorities thereof." It seems to me entirely clear that the only purpose of this change in the constitution was to take local and inferior courts out of the provision which made it necessary, under all circumstances, to elect them. It left the justices of the peace and district court justices in exactly the same position which they had previously occupied, but as to local and inferior courts it provided that they "shall be chosen by the electors of such cities, or appointed by some local authorities thereof"; but· it did not indicate any intention to modify the provision which had previously existed as to all judicial officers of cities,—that they should be chosen "in such manner as the legislature may direct." This view of the question is supported by the provisions of section 19 of the amended judiciary article of 1869, which provided:

"Inferior local courts of civil and criminal jurisdiction may be established by the legislature; and except as herein otherwise provided, all judicial officers shall be elected or appointed at such times, and in such manner, as the legislature may direct."

There was no provision in the constitution denying the right of the legislature to create inferior local courts, and section 19 was entirely unnecessary, unless it was to add the clause to the powers over these courts that they might "be elected or appointed at such times, and in such manner, as the legislature may direct." This, it will be seen, would have the effect of placing these inferior local courts in exactly the same position that they were in under the original constitution of 1846, except as to the matter of election or appointment, and which would give the same right to determine whether they should be chosen by districts or by the entire body of electors, which appears to have been conceded for a long series of years under the act of 1848. In other words the legislature, if it determined upon the election of these officers of local and inferior courts, could have exactly the same power. of determining the manner of election as under the original provision; and, if it adopted the system of appointment, it would have to determine upon the local authorities who were to be charged with this duty. I am supported in this view by the provisions of section 2 of article 10 of the constitution, which, while not controlling here, shows the general spirit of the constitution. It provides, among other things:

"All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose."

This provision has formed a part of the constitution since 1846, and indicates clearly that it has never been the intent of the constitution to require that all of the voters of a municipal corporation shall be called upon to vote for all of the officers who are to be chosen.

I am, nevertheless, persuaded that, when the constitution provided for taking these inferior local courts out of the provision which required their election, it imposed the duty upon the legislature of determining between the policy of election or appointment, and that it, by necessary implication, denied the power to the legislature to make use of the elective system in one portion of a municipality, and of appointment in another, for the same office. The language of section 17 of article 6 of the constitution of 1894, which is the same as that of the amended judiciary article of 1869, in so far as it has any relation to the question now before us, is that "all other judicial officers in cities  *  *  * shall be chosen by the electors of such cities, or appointed by some local authorities thereof." It is not that those officers shall be chosen by the electors and by appointment, to suit the political exigencies of the hour, but that they are to be chosen by the electors, or appointed by some local authorities thereof, and it is for the legislature to determine which one of these methods shall be adopted. In the original act (chapter 378, Laws 1897) it was provided, under title 3 (section 1390), that "for the purposes of administration of criminal justice the city of New York, as hereby constituted, is divided into two divisions," etc.; and provision was made for the changes which were made necessary by a consolidation of the various municipalities, and the mayor of the city of New York was authorized to appoint the various city magistrates who became the successors of the court of special sessions and of the police justice courts in other districts of the new city. This was an exercise of the discretion vested in the legislature, and was unobjectionable. In 1901, however, this title of the act was remodeled by the provisions of chapter 466, and it was provided that as to the First district, comprising the boroughs of the Bronx and of Manhattan, the mayor should continue to appoint the city magistrates; but as to the Second district it was provided (section 1392):

"At the general election to be held in the borough of Brooklyn in the year nineteen hundred and one, there shall be elected in each congressional district, as then constituted in said borough, one city magistrate, and in the territory constituting the borough of Brooklyn there shall be elected two city magistrates at large, and the terms of office of all said city magistrates so elected shall commence on the first day of January nineteen hundred and two and continue for six years thereafter."

Here we have an act in reference to the incorporation of a city, creating a court of equal jurisdiction for the entire city, yet one district has its magistrates appointed for a term of ten years, while the other has them elected for a term of six years. There has been no exercise of the discretion vested in the legislature in the creation of this court. It has neither provided for the election or appointment of the members of the court, but has made a combination, evidently dictated by political

considerations, of both systems. It has provided for the appointment and election of these magistrates. It has deprived the majority of the people of the city of New York of the power to determine who shall serve in the offices created for the purposes of administering criminal justice. It has vested in the mayor, chosen by all of the voters of the city of New York, the power to appoint the minority of the city magistrates, and it has vested in the voters of the boroughs of Brooklyn, Richmond, etc., who have already participated indirectly in the appointment of the magistrates from the First district, the power to elect the majority of this court; and the discretion which was given to the legislature to decide between the choice of these magistrates by election or appointment has not been exercised. In speaking of that clause of section 2 of article 10 of the constitution above quoted, the court, in the case of Rathbone v. Wirth, 150 N. Y. 459, 469, 45 N. E. 15, 17, 34 L. R. A. 408, say:

"Its very presence in the constitution of the state since 1846 evidences the importance which the people attach to the preservation of this right in the management of their local affairs. It means the right to choose their local officers, in all its reality, or it means nothing. If it does not mean that the people have reserved the right of administering existing local offices by officers of their own choosing, whether it be done directly, through an election, or indirectly, through the method of an appointment by some of their local authorities, I am at a loss to understand its significance, or in what consists its peculiar value. * * * The theory of the constitution is that the several counties, cities, towns, and villages are, of right, entitled to choose whom they will have to rule over them, and that this right cannot be taken from them, and the electors and inhabitants disfranchised, by any act of the legislature, or of any or all the departments of the state government combined. This right of self-government lies at the foundation of our institutions, and cannot be disturbed or interfered with, even in respect to the smallest of the divisions into which the state is divided for governmental purposes, without weakening the entire foundation; and hence it is a right not only to be carefully guarded by every department of the government, but every infraction or evasion of it to be promptly met and condemned,—especially by the courts, when such acts become the subject of judicial investigation."

If the city of New York is entitled to choose its own city magistrates, it is difficult to suggest a reason why the inhabitants of one portion of the city should be given a share in the indirect appointment of the members for the boroughs of Manhattan and the Bronx, and the absolute right to choose all of the city magistrates outside of those boroughs. This operates to disfranchise the boroughs of Manhattan and the Bronx to the extent that it denies them a voice in the selection of over one-half of the magistrates, while it enfranchises the other boroughs to the extent that they are permitted to participate in the election of the mayor who makes the appointments. It is such a discrimination as between the citizens of a single municipality, and so foreign to a system of government which is based upon the idea of equal political rights to all, that it cannot be within the purview of the legislature. If the city was divided into districts, and each district was permitted to elect or appoint its own city magistrates, I am of the opinion that the legislation would not be objectionable from a constitutional standpoint, but to create two districts, and to give the people of one district larger privileges than are enjoyed by the other, is quite another matter; and

for this reason I am willing to concur in the result reached by Mr. Justice BARTLETT.

Interlocutory judgment affirmed, with costs.

GOODRICH, P. J.   I cannot concur in the conclusion reached in the opinion of Mr. Justice BARTLETT.   I do not discuss any matters other than such as compel my dissent.

It is well to remember the fundamental law, so often declared, that the legislature has all power of legislation which the people of the state can grant, except as it is expressly or impliedly restrained from the exercise of particular powers by the constitution.   Rathbone v. Wirth, 150 N. Y. 459, 470, 45 N. E. 15, 34 L. R. A. 408; Koch v. City of New York, 152 N. Y. 72, 46 N. E. 170, and cases cited.   We have followed these authorities in McGrath v. Grout (decided at the present term of this court) 74 N. Y. Supp. 779.   In other words, the legislature has supreme and absolute authority unless it is fettered by constitutional impediments.   It is not altogether fanciful to point out the fact that the constitution itself recognizes this principle when it specifically provides that the enacting clause of all bills shall be "The people of the state of New York, represented in senate and assembly, do enact as follows."   Article 3, § 14.   A second cardinal rule is declared in People v. Draper, 15 N. Y. 532, where, at page 549, the court said:

"When the court declares a law unconstitutional, it, in effect, declares that the sovereign power of the people has so far been abdicated by themselves. This consideration has led the courts, in all governments which are based on the theory that all power resides in the people, to give a strict construction to compacts which deprive the people of this sovereign power. It will not be presumed that they intended to abdicate their power, unless they have so declared in express terms or by necessary implication. These principles are fundamental, conservative, and cannot be disregarded without infringement upon the reserved rights and power of the people. Hence the courts have frequently and uniformly declared that they will not adjudicate a law unconstitutional when it is to be made so by inferences or presumptions only, or when the question rests in doubt. Any other rule of construction would bring the legislative and judicial branches of government into collision, to the ruin of one or both."

We must therefore inquire whether there is any express inhibition in the constitution against the legislature creating the new office of city magistrate, and providing that the manner of election shall be by electors of congressional districts and of the borough of Brooklyn at large.   Section 1392 of the Revised Charter purports to do this.   If the legislature has such power, the section is constitutional; otherwise not.   The validity of the section depends chiefly upon the construction to be given to sections 17 and 18 of article 6 of the constitution.   Evidently these sections are interdependent.   Section 18 authorizes the legislature to establish local courts of inferior criminal jurisdiction.   There can be no possible question that this relates, though not necessarily exclusively, to courts not in existence at the time of the adoption of the constitution.   It then provides, "Except as herein otherwise provided, all judicial officers shall be elected or appointed at such times and in such manner as the legislature may direct."   Here is declaratory

expression of plenary power in the legislature to prescribe the manner of the election, and, unless its exercise has been curtailed by some other provision, section 1392 is constitutional, and within the power of the legislature. It is contended by the respondents that such restriction is found in section 17, which, after providing for the election of justices of the peace and district court justices, adds, "All other judicial officers in cities, whose election or appointment is not otherwise provided for in this article, shall be chosen by the electors of such cities, or appointed by some local authorities thereof." If it can be said that the last clause of section 17 relates exclusively to existing courts and judicial officers, and that the last clause of section 18 includes courts and officers not existing, there is no lack of harmony, and the constitutional scheme is evident and consistent, and not redundant. As I read the opinion of O'Brien, J., in the case of Curtin v. Barton, 139 N. Y. 505, 34 N. E. 1093, the court of appeals was of opinion that section 18 of article 6 was applicable only to existing courts. See page 510, 139 N. Y., and page 1094, 34 N. E. Section 17 provides for the election of three classes of judicial officers: First, justices of the peace in towns, who "shall" be elected by the town electors; second, justices of the peace and district court justices in cities, who "may" be elected in such manner as is or shall be prescribed by law; and, third, all other judicial officers in cities, who "shall" be chosen by the electors of such cities, or appointed by some local authorities thereof. At the time of the adoption of the constitution of 1894 the first two classes were existing constitutional officers, and the legislature had no power to abolish them. But the third class includes all other existing local judicial officers throughout the cities of the state, not referred to or specified, for the article speaks of such officers as officers whose election or appointment "is" not otherwise provided for in article 6. Manifestly the use of the verb "is," in the present tense, excludes all idea of any officers to be thereafter created by the legislature, else apt words would have been used to include them. The absence of any such words makes it apparent that the final clause of section 17, "not otherwise provided for in this article," points directly to the next section, where express power is given to the legislature to create new courts of civil and criminal jurisdiction, and to provide for the manner of election. It seems to me clear that section 17 refers to existing officers, and section 18 includes officers to be thereafter created by the legislature. If this construction is correct, the section in question is not unconstitutional. I find confirmation of this view by reference to the constitution of 1846, and the changes which have been made therein. The constitution of 1846, in section 14, contained a paragraph reading, in part, "Inferior local courts of civil and criminal jurisdiction may be established by the legislature in cities." Section 17 provided for the election of justices of the peace in towns, but nothing was therein said about the election of any other judicial officers. Section 18 declared that "all judicial officers of cities and villages, and all such judicial officers as may be created therein by law, shall be elected at such times and in such manner as the legislature may

direct." Thus provision was made for the creation of new courts in cities (section 14), and the election of justices of the peace in towns (section 17), and a sweeping provision that all existing judicial officers of cities and villages, and all such as might thereafter be created, should be elected in such manner as the legislature might direct (section 18). If the collocation had been continued, the present question could not have arisen, for no distinction was made between the method of electing existing judicial officers in cities and villages, and all such judicial officers as might thereafter be created therein by law. But the subsequent amendments adopted before the present constitution changed the order. Section 18 took the place of section 17, and there was added to the former section the provision that "all other judicial officers in cities, whose election or appointment is not otherwise provided for in this article, shall be chosen by the electors of cities, or appointed by some local authorities thereof," while a new section (section 19) was added, embodying the cited part of section 14, and adding the clause, "except as herein otherwise provided, all judicial officers shall be elected or appointed at such times, and in such manner as the legislature may direct." Thus for the first time the provisions for the election of justices of the peace in towns, and all other existing judicial officers in cities, were segregated into section 18; and provisions for new local courts, and the election in such manner as the legislature might direct of all judicial officers not already provided for, into section 19. I do not see how there could have been a more distinct differentiation of the purpose and intention of the framers of the constitution, between existing officers, whether constitutional or already created by the legislature, on the one hand, and future courts and their judges, on the other hand. The same collocation occurs in the present constitution. In section 17 are the provisions relative to the election of justices of the peace in towns, district court justices in cities, which were in existence before 1894, and all other judicial officers in cities whose election or appointment is not otherwise provided for in this article,—that is, article 6,—while in section 18 occurred the provisions for the creation of new courts, and, except as otherwise therein provided, which, I assume, still refers to the whole article 6, for the election of new judicial officers in such manner as the legislature may direct. In other words, section 17 limits itself to justices of the peace in towns, and district court justices and all other existing judicial officers in cities, while section 18 includes all other judicial officers of inferior courts to be thereafter created by the legislature. The office of city magistrate is not specified in words in any section of the constitution. The office of city magistrate in the old city of New York was created subsequently to the adoption of the present constitution. The office of city magistrate in the borough of Brooklyn was created by the Greater New York charter. As to this new office of city magistrate, the legislature had supreme power. It could create it, it could abolish it, it could provide the method and district of election. There is no provision of the constitution inhibiting the legislature from carrying out a new or selecting an

established political or territorial district in which the new judicial officer shall be elected, provided the principle announced in the Porter Case, 90 N. Y. 68, is not violated. The legislature may have unwisely exercised its power, but with that question we are not concerned.

It is said that the legislature may not provide for the election of a judicial officer by the electors of a district smaller than the entire territory in which he is to exercise his judicial powers, and that to hold otherwise is to disregard the spirit of our institutions. The constitution expressly provides for the election of justices of the supreme court by the electors of the eight judicial districts into which the state is divided, and these justices exercise their powers in any part of the state. Senators, assemblymen, aldermen, and supervisors are similarly elected by districts, and yet legislate for the whole state or for the city or county. Certainly there is no greater inharmony in the one case than in the other. The point which I desire to make is that there is nothing in the constitution which prevents the election by the electors of one district of an officer who is to exercise his functions in and over a district the electors of which have had no voice in his selection. Neither do I attach significance to the use of the words "the electors of such cities," as indicating that this necessarily means all the electors of the city. Such interpretation is not in accord with the general plan of the constitution. The spirit of the provision is observed if the choice of the judicial officer is made by electors of cities in any territorial division thereof. Neither do I think the point well taken that section 1392 of the Revised Charter is disapproved by the case of People v. Porter, 90 N. Y. 68. In that case the court held unconstitutional an act which assumed to create a police court for a district not coterminous with the boundaries of any county, town, city, or village. But this is not to say that an inferior local court may not be created for a district coterminous with any other political division of the state. It is true that the court said that the language of section 19 of the constitution did not "authorize the legislature to carve out from the territory of the state a district for judicial purposes, not bounded by town or county, city or village, lines, and erect thereon a local court." But the controversy before the court did not involve, nor bring before it, the question whether a congressional district was not, equally with those referred to, a recognized territorial or political division, which could be taken into consideration by the legislature in the formation of a new judicial district, and the remark is consequently a mere dictum. That august court has not expressed itself upon the question before us. The congressional district, while not referred to in the state constitution, is just as much a political or territorial division of the state as a village, town, or city, or a ward in a city. Each is created by act of the legislature. The states have surrendered to the federal government control over the method of administering federal legislative affairs, and the federal constitution provides that all legislative powers shall be vested in a congress, to be composed of members chosen by the people of the several states, and apportioned among the states according to a fixed ratio of population. The legislature has divided the state into congressional districts, and in so doing has erected the congressional dis-

tricts, sometimes by counties, and sometimes by wards and assembly districts. See chapter 295, Laws 1892. This power of the legislature to divide the state into or by congressional divisions other than those enumerated in the Porter Case has never been questioned, so far as I have been able to discover. So, also, the state constitution, in dividing the state into senate districts, recognizes other divisions than those referred to in the Porter Case. Entire wards are sometimes assembled by it into senate districts, and sometimes new senate districts, as in the case of the districts of the old city of New York, are carved out and created, without reference to ward lines. I am constrained, therefore, to believe that the legislature may just as well create a local court for a district coterminous with a congressional district as one coterminous with the divisions mentioned in the Porter Case.

Even if, however, the legislature is not authorized by article 6 to provide the manner of electing the new judges, it seems to me that such authority is clearly conferred in article 10, § 2, where it is said:

"All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this constitution, and all officers, whose offices may hereafter be created by law, shall be elected by the people, or appointed, as the legislature may direct."

The final clause seems to have been intended as an emphatic declaration of an intention on the part of the convention to confide to the legislature the power to provide the manner of electing new officers. This is still further emphasized by section 3 of article 12, which clearly authorizes the election of "judicial officers of inferior local courts" in any city or part of a city. I see no escape from the application of this provision to the city magistrates. It is a clear recognition of the authority of the legislature,—all the more that the final clause restates that the section applies to judges and justices of inferior local courts.

There is another fatal objection to the claims of the respondents. Section 1547 of the Greater New York charter provides that every person who shall be appointed to any office under the city government shall receive a certificate of appointment, designating the term for which such person has been appointed. The complaint sets out in full the mayor's certificates of appointment of the four answering defendants. They state that the mayor has appointed the several defendants as city magistrates "for a term commencing this day [May 15, 1901] and ending December 31, 1901." The answer admitted the language of the certificates, but alleged that, notwithstanding the statute as to the duration of the term, the appointment was for the term of 10 years specified in section 1392 of the charter. In People v. Hall, 104 N. Y. 170, 10 N. E. 135, the matter under consideration was an appointment by the mayor of the city of Troy of a chamberlain in place of Church, who had absconded. The mayor appointed Hall "to discharge the duties of the office of chamberlain during the absence" of Church. The claim was that the mayor, under the charter, had no power to make a temporary appointment, but had power to nominate for a full term,

and no other. The charter authorized the mayor to nominate to the common council a chamberlain for the term of three years, and, in the event of the absence of the chamberlain, to appoint a person to discharge his duties during such absence. The court (Judge Andrews writing) said that the appointment of Hall plainly indicated on its face that it was an attempt to exercise the power conferred by this latter provision, and that it was not intended as a nomination for a full term; that the mayor supposed he had the power, and undertook to execute that power, and that alone. The court quoted with approval the language of Lord Coke (Co. Litt. 258a):

"Regularly it is true that when a man doth less than the commandment or authority committed to him, then the commandment or authority not being pursued, the act is void. And when a man doth that which he is authorized to do, and more, that is good for that which is warranted, and void for the rest. Yet both these rules have divers exceptions and limitations."

It was held that there were very strong reasons, founded in public policy, against permitting a person to hold public office against the intention and through the mere mistake of the appointing power. The court added:

"It might very well be that the public interests would, in the judgment of the mayor and common council, require a different appointment for a full term than for a temporary period. The restrictive words in the appointment cannot be disregarded without changing the essential character of the appointment. They constitute an integral part of the transaction, and cannot be separated from the prior words without subverting the whole intention of the appointing power. We conclude, therefore, that if the power to make a temporary appointment could not, under the circumstances, be exercised, the appointment of Hall was void, and did not inure as an appointment for a full term."

In the case at bar, according to the contention of the respondents, the mayor exercised less than his authority. It was clearly his intention to appoint the respondents only for the remainder of the year 1901, and that appointment is a nullity and void. The respondents have no valid title or appointment to office for the year 1902, and are not in office, and cannot, as prayed for by them, be adjudged lawfully entitled to hold office for the term of 10 years from the date of their appointment.

Neither do I agree with the conclusion that the provisions in regard to the two magistrates at large are so interwoven with the entire scheme of the section as to be indivisible from it, and that all the legislation on the subject of city magistrates for the borough of Brooklyn must stand or fall together. In Duryee v. Mayor, etc., 96 N. Y. 477, the court said at page 491:

"It is only when the various enactments of a legislative body are plainly dependent upon each other, and so inseparably connected in matter and design that they cannot be divided without defeating the object of the statute, that the invalidity of one provision will entail that of those remaining. If effect can, consistently with the general legislative intent, be given to such parts of a statute as are not in conflict with paramount authority, and are within the authority of the body enacting them, it is the duty of a court, while rejecting its unconstitutional and unauthorized parts, to enforce the remaining provisions of a law which are within the legislative power of its authors. When part only of a statute or a section is unconstitutional, that part only is void, unless the other provisions are so dependent and connected

with that which is void that it cannot be presumed that the legislature would have enacted the one without the other." Citing Sedg. St. Const. 413; Com. v. Hitchings, 5 Gray, 482.

In the Hitchings Case the supreme court of Massachusetts said:

"The constitutional and the unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand, though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial, but whether they are essentially and inseparably connected in substance."

In the light of this authority, I do not see why the part of section 1392 which provides for the election of two magistrates at large is not severable from the remainder. The part of the section which we are to construe reads as follows:

"At the general election to be held in the borough of Brooklyn in the year nineteen hundred and one, there shall be elected [in each congressional district, as then constituted in said borough, one city magistrate, and] in the territory constituting the borough of Brooklyn [there shall be elected] two city magistrates at large."

Striking out the parts in brackets, the rest of the sentence is complete in and by itself. It provides a system for the election of two magistrates, which is clearly not open to the objections urged as to the election of magistrates by the electors of congressional districts; that is, by all the electors of a city which was in existence when the constitution was adopted. Under it the electors of the whole borough have elected two city magistrates,—the defendants Durack and Ingersoll,—and the will of the electors thus expressed ought not to be defeated unless the legislation is clearly unconstitutional, and unless such unconstitutionality is beyond rational doubt. People v. Draper, supra.

For these reasons, I think that the judgment should be reversed.

HIRSCHBERG, J. I dissent from the result reached by the majority of the court. My reasons may be briefly expressed:

The onus is on those who challenge the constitutionality of an act of the legislature to point out the precise provision of the fundamental law which is deemed to be infringed. In this case the main contention seems to be that section 17 of article 6 of the constitution requires all the electors of the city to vote for each magistrate, if the office is elective, while the law which is herein assailed limits the exercise of the franchise in each case to a prescribed section or division of the city. While the respondents' contention is apparently supported by some of the general expressions contained in the opinion delivered in People v. Porter, 90 N. Y. 68, I think that case should be confined to the facts before the court, and the conditions existing at the time when it was decided. The court had in mind cities as they then existed in this state. The Greater New York has been created since, and, as a city, is unique in including several counties whose entity as such political divisions of the state is still continued, notwithstanding the legislative fusing of such counties into a single municipality. The spirit of the reasoning in the Porter Case, therefore, has no necessary appli-

cation to the city thus created. I find no other case in this state which can be deemed to accord with the respondents' contention. The contrary has been held in other jurisdictions in well-considered cases. Thus, in State v. McAlister, 88 Tex. 284, 31 S. W. 187, 28 L. R. A. 523, it was held that, where the constitution provided that "all qualified electors * * * within the limits of a city * * * shall have the right to vote for mayor and all other elective officers," this provision merely secured to the voters of each city the right to cast their ballots for all officers to be elected for the particular subdivision of the city for which such officers are chosen. The court said (page 288, 88 Tex., page 189, 31 S. W., and page 523, 28 L. R. A.):

"The words 'all other elective officers' mean all such officers of the city as the law might make elective; but this language, when taken in connection with the remainder of the section, does not necessarily mean that every elective officer must be elected by the voters of the entire city."

So, in Brown v. Holland, 97 Ky. 249, 30 S. W. 629, where the constitution required the officers of towns and cities to be elected "by the qualified voters thereof," it was held, as per the headnote, that the general assembly might lawfully provide "that councilmen 'shall be elected by a majority of the votes cast by the qualified voters of the wards for which they respectively stand'; it not being necessary that they should be elected by the voters at large before it can be said they are 'elected by the qualified voters of the city.'"

In order to reach the conclusion that the constitution has been violated in this case, it is necessary to import words into the document which are not there, or to import ideas into it by ingenious construction. The constitution only provides that the officers in question "shall be chosen by the electors of such cities, or appointed by some local authorities thereof." There is no magistrate, under the law in question, as I understand, who has not been either chosen by the electors of New York, or appointed by a local authority. If each judicial officer must be chosen by all the electors of the city, there is no reason why the fact should not have been inserted in the provision in set terms. If, in a city like New York, all the local magistrates must be either elective or appointive, there is no good reason why the constitution should not have so stated explicitly. It may be granted that the language actually employed might be open to either or both constructions, but the point is that neither idea is expressly stated or necessarily conveyed. Under such circumstances, the courts may not add or take away by the process of judicial interpretation. As was said in People v. Rathbone, 145 N. Y. 434, 438, 40 N. E. 395, 396, 28 L. R. A. 384:

"The latitude allowed in the construction of legislative acts is out of place, and would be unwise, when interpreting the fundamental law. Legislation aims at arranging the mechanism of the state for the benefit of its members, and the question of intention, necessarily, is often of great importance, and must be open to judicial inquiry; but the constitution, which underlies and sustains the social structure of the state, must be beyond being shaken or affected by unnecessary construction or by the refinements of legal reasoning."

I vote for reversal.